IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MJM ELECTRIC, INC

    Plaintiff,

vs.

Case No.: 8:22-cv-2008

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURG, PA,

    Defendant.

_____/

## COMPLAINT

Plaintiff MJM Electric, Inc. ("MJM"), by and through undersigned counsel sues National Union Fire Insurance Company of Pittsburg, PA. ("Surety") and alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1. This is an action against a payment bond issued by Surety for damages in excess of $75,000.00, exclusive of interest and attorneys' fees.

2. MJM is a Florida corporation incorporated under the laws of Florida with its principal place of business located at 3225 E. 4th Avenue, Tampa, Florida 33605. MJM is an industrial and heavy commercial electrical contractor and citizen of Florida.

3. Surety is a Pennsylvania corporation incorporated under the laws of Pennsylvania with its principal place of business located at 625 Liberty Avenue, #1100, Pittsburgh, PA 15222. Surety's headquarters, which is the actual center of

direction, control, and coordination of Surety's business, is located in Pennsylvania. Surety is a citizen of Pennsylvania.

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2). This action arises out of a construction project located at Tampa International Airport ("TIA") such that a substantial part of the events giving rise to rise to MJM's claims occurred in this judicial district.

## GENERAL ALLEGATIONS

### B. The Bonded Project

6. On or about November 30, 2017, the Hillsborough County Aviation Authority ("HCAA" or "Owner") advertised for bid HCAA Project Number 5991 14, Checked Baggage System Upgrades and Optimization (the "Project"). The overall Project scope included the design and construction of new checked baggage inspection systems for Airsides A and C, including removal of the checked baggage systems in the Main Terminal, and the design and construction of a new remote baggage check-in facility at a newly constructed rental car facility.

7. The Project was scheduled to be completed in two main phases. Phase 1 of the Project included the work for the Consolidated Rental Car Facility ("ConRAC"), and Phase 2 of the Project included the work for A-Sortation, Airside C, and the Main Terminal, to be sequenced in that order. The scope of work for Phase 2 was significantly larger than that of Phase 1.

8. The Project was awarded to Hensel Phelps Construction Co. ("Hensel Phelps" or "Design-Builder"), and on or about April 5, 2018 the HCAA and Hensel Phelps entered into a written agreement to design and construct the Project.

9. Hensel Phelps, in turn, entered into a contract with Pteris Global (USA), Inc. ("Pteris") on or about May 15, 2018 for the design and construction of the Baggage Handling Systems and Baggage Handling System Controls ("BHS Scope").

10. Surety issued a payment bond, Bond No. 930555, on or about July 12, 2018, with a duplicate original bond issued on September 18, 2018, in the amount of $22,501,922.00, with Pteris as bond principal and Hensel Phelps as obligee (the "Bond"). A copy of the Bond issued by Surety is attached as **Exhibit "A."**

    **C.**    **MJM is asked to provide a proposal for the BHS Scope electrical installation.**

11. In March 2018, Hensel Phelps contacted MJM to inform MJM that Pteris would be performing the BHS Scope and to suggest that MJM provide a proposal for the electrical installation portion of the BHS Scope. Notably, professional design services were never contemplated for the electrical installation portion of the BHS Scope.

12. Due to the fact that Pteris's design for the BHS Scope was still in the early stages of development, Pteris instructed MJM to bid the project based on a conceptual design, which included wire basket-type cable trays with excess cables coiled in the basket tray and cables with factory-made plugs, and provided pictures to MJM to demonstrate Pteris's design intent.

13. The bid documents Pteris provided to MJM specified that the Project would use ethernet cables premanufactured by Allen-Bradley, with plug connectors already connected to the cables. All of these cables were to be provided by Pteris.

14. Included in the bid documents supplied by Pteris on which MJM was to base its proposal was Pteris's baseline schedule for Pteris's scope of work. Pteris's baseline schedule stated that the design for Phase 1 would be completed by June 1, 2018 and that the design for the first two areas of Phase 2—A-Sortation and Airside C—would be completed by October 1, 2018. The original completion date set forth in Pteris's baseline schedule was June 5, 2020.

15. On or about April 20, 2018, MJM provided Pteris with a written proposal for the work. MJM specified that its proposal was based upon Pteris's baseline schedule, including the design milestones referenced above as well as the milestone dates in Pteris's baseline schedule for the design, delivery, and installation of the conveyor system to be performed by Pteris's separate mechanical subcontractor. MJM further specified that its proposal was based on Pteris's design intent shown in the materials provided by Pteris. Due to the lack of clarity regarding the design at that stage, MJM's proposal was explicitly conditioned upon receipt of the 60% design drawings no later than 60 days before mobilization and 90% design drawings prior to mobilization.

16. On or about June 18, 2018, MJM and Pteris entered into a written subcontract for, generally, the electrical installation of the BHS Scope ("Subcontract"). MJM's April 20, 2018 proposal was incorporated into the Subcontract, the terms of

which took priority over all other portions of the Subcontract. Pteris agreed in the Subcontract that "[p]ayment for each invoice shall be made by [Pteris] within 30 days of the invoice submission date."

17. Despite Pteris agreeing to provide MJM with 90% design documents prior to MJM's mobilization, which would have included such information as the final layout, cable schedules, conduit schedules, specific detail drawings, etc. that would culminate in an issued -for-construction ("IFC") set, Pteris directed MJM to mobilize and start their work without providing anything that could be considered close to 90% design drawings.

**D.    MJM begins its work under the Subcontract.**

18. MJM mobilized to the Project site in late July/early August of 2018 and began their scope of work for Phase 1. Phase 1 was successfully completed using the Allen Bradley cables specified in the bid documents. However, Pteris failed to provide necessary coordination, supervision, and support during Phase 1, and the design provided by Pteris for the Phase 1 work was, at best, incomplete and insufficient for construction. For example, Pteris provided MJM with what Pteris referred to as 60% design drawings for the Phase 1 work and then later presented MJM with a drawing package Pteris represented to be final that was marked "Revise and Resubmit" by the HCAA.

19. Pteris continued to provide revisions to the Phase 1 design drawings as late as mid-November 2018 with no communication to MJM regarding how the design was changing or would be changed, what drawings were conceptual, what drawings

were 90%, what drawings had been issued to the Owner for approval, and what drawings were actually approved for construction. Despite Pteris's complete lack of coordination and support and incomplete and inadequate design, MJM was able to complete its Phase 1 work with minimal issues.

### E.  Pteris changes the fundamentals of the design for Phase 2.

20. In October 2018, Pteris notified the HCAA that Pteris's design intent was based on the electrical installation at the Orlando International Airport. Following a site visit to the Orlando International Airport by the HCAA, Hensel Phelps, and Pteris, Pteris's proposed design—the design on which MJM's proposal was based—was apparently rejected. Following the disapproval of Pteris's proposed design for the electrical installation of the BHS scope, Pteris directed MJM to install a wireway system for Phase 2, which was a significant change from the installation method on which Pteris directed MJM to base its proposal.

21. In preparation for MJM's Phase 2 work, MJM asked Pteris whether MJM would be receiving fully engineered design drawings issued for the construction of Phase 2. To demonstrate the industry-standard expectation, MJM provided Pteris examples of engineered electrical drawings issued for construction that contained the information and detail necessary for an electrical contractor to complete the installation. Several days later, Pteris responded that they did not provide this information because they did not have anyone on their team that could perform this work and that they normally "engage" their subcontractors to provide this engineering.

Pteris then requested the MJM provide this engineering, which was outside the scope of MJM's contract.

22. As of late December 2018, Pteris's design for Phase 2 remained insufficient and incomplete, and MJM still had no clear answer regarding how the remainder of the Project would be installed. Additionally, despite working on the Project for over four (4) months and submitting monthly progress invoices, Pteris had failed to make any payments to MJM.

23. MJM met with Pteris to discuss the many ongoing issues that were plaguing MJM's work on the Project. These issues included, but were not limited to: inadequate document control systems and insufficient notice to MJM of changes to the design, changes to design documents that were not identified or documented properly, insufficient information on design documents, delays in receiving Pteris-provided materials, continual changes in Pteris project management and supervisory personnel with no clear indication of who has authority on matters of design, work requests, and authorization of change orders, and lack of payment. Pteris assured MJM that it would address these issues and finally made its first payment to MJM on the last business day of December.

24. At Pteris's request, MJM engaged an electrical engineer to finalize Pteris's design for construction. MJM's engineering partner was immediately confronted with the inadequacy of Pteris's design, which include a lack of basic, necessary information needed to finalize the design or begin procuring materials as

well as equipment designations and information that conflicted with information provided by the HCAA's engineer of record.

25. As of January 2019, when MJM was originally scheduled to begin its work on Phase 2, Pteris still had not provided MJM with necessary information such as the installation method, cable schedules and riser diagrams, panel schematics, complete materials lists, delivery dates for Pteris-supplied materials, and the defined scope of engineering support MJM was to provide. MJM informed Pteris that the lack of this information was severely limiting MJM's ability to move forward with MJM's scope of work.

26. With the Project already behind schedule, Pteris finally provided MJM with the minimum information necessary to allow MJM to provide preliminary pricing for the installation of the revised design and scope of work, that accounted for, among other items, increased site support, supplemental engineering, and the utilization of the wireway system. MJM provided Pteris with a revised pricing proposal for the revised scope of work on February 27, 2019 and requested that Pteris expedite its review of MJM's revised proposal and request any clarification it needed to avoid additional schedule delays.

27. As had become custom, Pteris upper management was seemingly unaware of why MJM's revised pricing proposal had increased from its original proposal. Pteris's own site project manager was required to explain to upper management that "[t]he additional contract cost has nothing to do with ConRac [*i.e.,* Phase 1]. There is an add of $1.3 Million for the new project design associated with A

& C. We were obligated to produce a 90% set of design documents before mobilization and we did not do so. The design was just made available recently."

28. As of March 2019, MJM's progress had already been delayed by two months by Pteris's lack of communication, inadequate and incomplete design, and failure to act on MJM's revised pricing proposal, and MJM notified Pteris of this delay.

29. In April 2019, Pteris provided HCAA with a recovery schedule to ameliorate the Project delays without seeking any input from MJM or even informing MJM of the existence of a recovery schedule or that Pteris was submitting a recovery schedule to the HCAA. MJM was not made aware of the recovery schedule until it was provided to them by Hensel Phelps in June 2019. When finally given the opportunity to review the recovery schedule, MJM determined that the recovery schedule was neither realistic nor achievable.

30. As of the end of May 2019, Pteris had failed to either approve MJM's revised pricing proposal, or even process partial payment for the limited ongoing work MJM was able to provide for Phase 2. Instead, Pteris only committed to MJM that it was issuing a "purchase order" for only the remainder of MJM's original proposal, which itself was delayed.

31. After additional payment delays by Pteris, Pteris promised MJM on June 7, 2019 that MJM would receive a purchase order by the end of the day. On this representation, MJM agreed to mobilize to begin the installation of the A-Sortation work and informed Pteris that it would have a crew onsite for this work beginning the week of June 17, 2019. However, when MJM mobilized to the site the week of June

17, 2019, they were informed that they were not allowed to perform any work on A-Sortation at that time. As another example of the constant personnel turnover within Pteris and the lack of communication, a new Pteris project manager claimed to be completely unaware that MJM intended to mobilize to the Project site that week.

32. Over the first six months of 2019, MJM expended significant effort in trying to determine a set, defined scope of work with Pteris, including carefully laying out all of the items that were included in MJM's original proposal and drafting a baseline statement of work for the remainder of the Project. Pteris refused to assist MJM in this endeavor and refused to even engage with MJM in trying to define the scope of work or acknowledge that any information was lacking from the initial bid package.

33. On or about July 1, 2019, MJM submitted a proposed change order, Change Order #17, to Pteris for the costs associated with the expanded scope of work in the amount of $1,188,120.00. Although presented in a change order, this was generally information that Pteris had in its possession since MJM provided is revised pricing proposal for the revised scope of work over four (4) months earlier in February. Along with its change order proposal, MJM submitted a schedule for the remainder of the A-Sortation and Airside C work, reiterated that the recovery schedule Pteris submitted without consulting MJM was unrealistic, and stated that to meet MJM's schedule, MJM would need unencumbered access when requested and proper coordination with all parties. MJM informed Pteris that the change order would need

to be approved in its entirety by July 24, 2019 in order to maintain the pricing terms and schedule. Pteris failed to approve this change order.

34. Pteris's mechanical contractor responsible for installing the conveyor system, which was critical to MJM's schedule, stopped work and demobilized from the Project in July 2019.

35. In August 2019, Pteris, through Pteris's then-current on-site project manager, requested that MJM break up its pricing for the revised scope of work—that had been in Pteris's possession since February—into individual change orders for each line item on the representation that this would allow the change orders to be reviewed and processed individually and promptly. Specifically, Pteris represented to MJM that by breaking up their revised pricing proposal into individual components, the processing would occur within a couple weeks. MJM complied with this request and sent Pteris detailed change orders for each individual line item. Pteris, however, did not process or pay any of these change orders.

36. Over the next several months, MJM continued in good faith to perform the portions of the wireway installation in A-Sortation and Airside C that Pteris had been authorized via Pteris's partial purchase order from June. However, Pteris continued to delay the execution of the change order for the remainder of the wireway installation necessitated by the design changes to allow MJM to order its materials and schedule its workforce to perform this work. Additionally, MJM's work was further delayed by the continued delay in conveyor installation by Pteris's mechanical subcontractor. By late October 2020, MJM notified Pteris that MJM was forced to

reduce manpower as MJM was running out of productive, approved work to perform. However, MJM continued to incur extend overhead and general conditions costs in maintaining a limited crew and remaining mobilized. At this point, MJM's revised pricing proposal for the revised scope of work had been in Pteris's possession for eight (8) months.

37. Based on direction from Pteris, MJM agreed in good faith to remobilize to the site in January 2020 to begin the bulk of MJM's now-revised scope of work on the A-Sortation and Airside C areas of Phase 2. Given the continuing changes to the design and conflicting design information, MJM's agreement was made on the express condition that Pteris assumed all risk and costs for MJM proceeding with an incomplete and inadequate design and the ongoing lack of coordination from Pteris. At this point, MJM's work on these areas had been delayed for approximately one year.

38. Almost immediately after remobilizing, MJM again ran into the same Pteris-driven issues with a lack of coordination and untimely provision of information from Pteris, inadequate and incomplete design materials, and areas of the Project not ready for MJM's work. This quickly led to additional schedule delays due in no part to MJM's actions. To recover, or partially recover, these delays, Pteris directed MJM to accelerate their work, and MJM submitted a change order for its acceleration costs to Pteris. Pteris failed to timely approve this change order.

39. Pteris's lack of coordination, inadequate and conflicting design information, and continued design changes—often after MJM had already completed

the installation of the work to which the design change was directed—further delayed MJM's progress. Throughout February and March of 2020, MJM continued to document missing parts, materials and equipment that Pteris was to provide, incomplete conveyor system work, and incomplete and inadequate design information on a near-daily basis. In turn, Pteris refused to be transparent about material on hand to complete installation, the timeline for delivery and installation of the conveyor system, coordination with the HCAA and approval of installation methods, and availability of Pteris personnel to manage the site.

40. During Phase 2, Pteris was ultimately unable to secure the required number of premanufactured Allen Bradley cables and, instead, directed MJM to source and procure bulk cable with no terminations. Pteris then directed MJM to install the bulk cable, including installing terminations on the bulk cable as needed. As this was work outside the scope of MJM's proposal and a change to the information on which MJM based its proposal, MJM followed Pteris's instruction on the condition that MJM be paid for its time and materials. Pteris's failure and direction to proceed with changed work required MJM to install hundreds of ethernet terminations that were not specified in, or reasonably inferable from, the bid documents. Pteris has refused to compensate MJM for this work.

41. In September 2020, Pteris acknowledged that MJM had not been provided with the network architecture layout in the bid materials and requested that MJM provide Pteris with a price proposal to make the necessary network connections, and MJM provided Pteris with the requested proposal. As had become custom, Pteris

reversed course and rejected MJM's pricing proposal for the network connections, claiming that the work was included in MJM's original scope of work. Pteris then demanded that MJM proceed with the increased scope of work with no additional compensation and threatened the assessment of liquidated damages.

42.     In October 2020, Pteris notified MJM that Pteris believed MJM's refusal to perform the out-of-scope network terminations and connections work without compensation to be a default under the Subcontract. Pteris revealed that the basis of this belief was that Pteris apparently thought it issued MJM a change order in April 2019 that accounted for the change in the installation method from Phase 1 to Phase 2. MJM was forced to again explain to Pteris that Pteris never issued such a change order and its mistaken belief stemmed from its personnel turnover, lack of communications, and general lack of on-site presence.

43.     As Phase 2 of the Project progressed, MJM continued to use its best efforts to perform its work in the face of open issues at the time of installation such as shortages of Pteris-supplied cable and equipment and a lack of direction from Pteris.

44.     The A-Sortation and Airside C work of Phase 2 was largely completed in January 2022. The Main Terminal work of Phase 2 is currently scheduled to begin in September 2022. Additionally, the Main Terminal scope of work has increased more than four-fold since MJM originally provided its proposal, and MJM reasonably believes that Pteris will continued to demand that MJM perform out-of-scope work and incur significant additional delay costs without compensation.

45. Pteris has failed and refused to compensate MJM for out-of-scope work, significant delays caused by Pteris, and additional work required by continuous design changes resulting from Pteris' inadequate design and lack of proper project management and coordination.

46. All conditions precedent to the initiation of this action have been performed, waived, or otherwise satisfied.

47. Due to the failure of payment described herein, MJM has been forced to retain the services of the undersigned and has agreed to pay the undersigned a reasonable fee for their services.

## COUNT I – BREACH OF PAYMENT BOND

48. MJM incorporates and re-alleges paragraphs 1 through 47 as if fully set forth herein.

49. Surety issued the Bond, which is a written, express contract.

50. The terms of the Bond state "that every Claimant as herein defined, who has not been paid amounts due for labor, materials or equipment used or reasonably required for use in the performance of the Subcontract[1] may recover such amounts from Surety under this Bond."

51. MJM is a Claimant as defined by the Bond.

---

[1] The term "Subcontract" within the language of the Bond refers to the subcontract between Hensel Phelps and Pteris.

52. MJM has not been paid amounts due for labor, materials or equipment used or reasonably required for use in the performance of the contract between Hensel Phelps and Pteris.

53. On March 10, 2022, MJM provided a notice of non-payment to Surety in the amount of $2,211,048.36. To date, MJM has received no response whatsoever from Surety to MJM's notice of nonpayment.

54. Surety has failed to provide payment to MJM thereby materially breaching the terms of the Bond.

WHEREFORE, MJM demands judgement in its favor and against Surety for damages in an amount to be determined by the trier of fact, interests, costs, and attorney's fees pursuant to the Subcontract and such other and further relief deemed appropriate.

Date: August 31, 2022

By:     */s/ William F. McFetridge*
**MATTHEW B. TAYLOR**
Florida Bar No. 322570
**WILLIAM F. MCFETRIDGE**
Florida Bar No. 95218
JOHNSON, POPE, BOKOR, RUPPEL & BURNS, LLP
401 E. Jackson Street, Suite 3100
Tampa, FL 33602
wmcfetridge@jpfirm.com (Primary)
matthewt@jpfirm.com (Primary)
akelley@jpfirm.com (Secondary)
Telephone: (813) 225-2500
Facsimile: (813) 223-7118
*Attorneys for MJM Electric, Inc.*